IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| | ) | |
| ALNO AG,[1] | ) | Case No. 18-12651 |
| | ) | |
| Debtor in a Foreign Proceeding. | ) | |
| | ) | |

DECLARATION OF TOBIAS WAHL IN SUPPORT OF (I) VERIFIED
PETITION OF FOREIGN REPRESENTATIVE FOR RECOGNITION OF FOREIGN
MAIN PROCEEDING; AND (II) MOTION OF THE FOREIGN REPRESENTATIVE
FOR ENTRY OF FINAL ORDER GRANTING RECOGNITION OF
FOREIGN MAIN PROCEEDING AND CERTAIN RELATED RELIEF

I, Tobias Wahl, declare as follows:

1. I am the the court-appointed special insolvency administrator and duly authorized foreign representative ("Foreign Representative") for Alno AG ("Debtor") in the United States.

2. On July 12, 2017, the Debtor commenced an insolvency proceeding (the "German Proceeding") by filing a petition to open insolvency over the assets of the Debtor under the German Insolvency Code, *Insolvenzordnung* (the "German Insolvency Code") pending before the lower court of 72379 Hechingen, Baden-Wuerttemberg, File-No 10 IN 93/17 (the "German Court"). By order of July 13, 2017, the German Court started a provisional insolvency proceeding over the assets of the Debtor. The Debtor managed the insolvency proceedings under § 270 of the German Insolvency Code and appointed a partner of the Foreign Representative, Prof. Dr. Martin Hörmann (the "German Insolvency Administrator"), as provisional custodian. Under German law the role of a custodian in provisional insolvency

---

[1] The Debtor does not have an Employer Identification Number. The Debtor's Commercial Register Ulm Number is HRB 727041. The Debtor's headquarters are located at 47 Heiligenberger Strasse, 88630 Pfullendorf Baden-Wuerttemberg, Germany.

proceeding is to supervise the debtor in possession. On August 29, 2017, the German Court converted the case, and the German Insolvency Administrator was appointed as provisional insolvency administrator. With the same order the German Court transferred the right to dispose of the Debtor's assets to the German Insolvency Administrator. The Debtor was no longer allowed to administer its own case. On October 1, 2017, the German Court opened an insolvency proceeding over the assets of the Debtor and appointed Dr. Hörmann as the German Insolvency Administrator. A true and correct certified translation of the order (the "Commencement Order") of the German Court opening the German Proceeding and appointing Dr. Hörmann as the German Insolvency Administrator of the Debtor in the German Proceeding is attached as Exhibit A to the Verified Petition of Foreign Representative for Recognition of a Foreign Main Proceeding (the "Verified Petition"), filed contemporaneously herewith.

      3.      On October 18, 2018, the German Court appointed me as the Foreign Representative for the specific purpose of handling assets and claims located in the United States, including filing for Chapter 15 registration under the Bankruptcy Code (the "Appointment Order"). A true and correct certified translation of the Appointment Order in the German Proceeding is attached as Exhibit B to the Verified Petition. As reflected therein, the German Court ruled on my appointment on October 18, 2018. The copy of the Appointment Order attached as Exhibit B is stamped "received" on October 23, 2018.

      4.      The powers the German Court has conferred upon me, in my capacity as the Foreign Representative, pursuant to the Appointment Order include the following: (1) determination, administration and realization of any assets of the Debtor in the United States; and (2) specifically, I, as the Special Insolvency Administrator, am authorized to file for and to conduct on account of the insolvency estate for the Debtor a secondary insolvency proceeding in

the United States under Chapter 15 of the United States Bankruptcy Code (the "Bankruptcy Code"). Appointment Order, p. 1.  Further, I am entitled to perform any actions, to take all measures and to issue all declarations which the German Insolvency Administrator would have been entitled to, had he initiated these proceedings.  *Id.*

5. On the date hereof, I have filed a Verified Petition with the documentation required by Sections 1504 and 1515 of the Bankruptcy Code seeking the entry of an order recognizing the German Proceeding as a "foreign main proceeding," and granting relief under Sections 1520 and 1521 of the Bankruptcy Code.  I make this declaration in support of the Verified Petition, as well as the Foreign Representative's request for entry of an order granting final relief in aid of the foreign main proceeding, and certain related relief.

6. I am an attorney qualified to practice law in Germany and have been practicing in the field of insolvency law for over 20 years.  I am specifically qualified in Germany as a lawyer specializing in insolvency law, a qualification granted by the German bar association to members who take a special course in insolvency, pass an exam, and establish practical experience in insolvency law.  I am regularly appointed as insolvency administrator by numerous insolvency courts in Germany.  I also act in cross-border insolvencies and have previously been qualified as the authorized foreign representative in a recognized Chapter 15 case in this judicial district.  *See In re Reutax AG*, No. 13-12135 (D. Delaware) (Dkt. Nos. 28, 35).

7. In my capacity as court-appointed and duly authorized Foreign Representative of the Debtor, I am familiar with the Debtor's liquidation efforts and financial affairs and I have been closely involved in the Debtor's liquidation and recovery efforts.  I am over the age of 18 and, if called upon, could and would testify to the facts set forth in this

declaration. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information supplied to me by members of the Debtor's management and professionals, learned from my review of relevant documents, or my opinion based upon my experience.

## BACKGROUND

### A. General Background

8. The Debtor engaged in the development, production, and sale of kitchen furniture worldwide. Its products included drawers and baskets, added value features, glass and metal, light systems, and niche systems. The company offered its products under the ALNO, WELLMANN, PIATTI, ALNOINOX, and PINO brands. It also sold electrical appliances and accessories. The Debtor was founded in 1927 and is headquartered in Pfullendorf, Germany.

9. Prior to the commencement of the German Proceeding, the Debtor employed approximately 670 employees (1,500 in total among the Debtor and its affiliates), and operated its business primarily from Pfullendorf, Germany, where it owned property.

10. The Debtor is incorporated pursuant to the German Commercial Register Ulm. Its registered office and its principal place of business is 47 Heiligenberger Strasse, 88630 Pfullendorf Baden-Wuerttemberg, Germany.

11. The Debtor does not have principal offices in the United States, nor is there litigation known to be pending by or against the Debtor in the United States. To my knowledge, the Debtor's assets that are located in, or relate in any way to, the United States consist of (i) potential causes of action against Whirlpool Corporation, a Delaware corporation ("Whirlpool"), and Mr. Marc Bitzer, Whirlpool's Chief Executive Officer, as further detailed herein, (ii) the security retainer paid to the Debtor's Delaware counsel in advance of its Verified

4

Petition filing in the amount of $150,000, and a smaller security retainer in the amount of $1,500 paid to the Debtor's counsel in Chicago, and (iii) the Debtor's indirect ownership interest in and direct claim against ALNO USA Corporation, an affiliate of the Debtor, in *In the Matter of the General Assignment for the Benefit of Creditors of Alno USA Corporation*, No. 247-17, pending in the Superior Court of New Jersey, Chancery Division (the "ALNO USA Assignment Proceeding").[2]

B.    **The Debtor's Liquidity Crisis and Restructuring Attempts**

12.    The Debtor and its affiliates (the "ALNO Group") were faced with continuous financial difficulties after the Debtor went public during the financial year 1995, consistently showing negative financial results. As of December 2016, the ALNO Group showed a negative shareholder equity of approximately 98.6 million EUR.

13.    Since 2010, if not earlier, ALNO Group faced major financial crises and was on the verge of insolvency. In June 2010, PriceWaterhouseCoopers ("PwC") submitted a restructuring report regarding ALNO Group (the "Restructuring Report"),[3] which showed that ALNO Group could only be restructured with substantial restructuring contributions by various stakeholders. PwC did not confirm a positive restructuring prognosis. The Restructuring Report stated that, as of January 31, 2010, ALNO Group had available funds of 3.95 million

---

[2] The Debtor is the sole shareholder of Zweimarkenholding Impuls GmbH, a German corporation, which in turn is the sole shareholder of ALNO International GmbH, also a German corporation. ALNO International GmbH owns 100% of the shares in ALNO USA Corp. The Debtor's claim in the ALNO USA Assignment Proceeding is in the amount of $720,864. The German Insolvency Administrator currently expects to recover little or nothing from the ALNO USA Assignment Proceeding, either through the Debtor's indirect equity in ALNO USA Corp. or through its claim against ALNO USA Corp.

[3] Such restructuring reports are customary in Germany. Creditors are not allowed to finance in crisis situations unless there is evidence that the business can be turned around with the contributions by the various stakeholders. This evidence is provided by such a restructuring report.

EUR with due liabilities of 28.155 million EUR, including 27.786 million EUR due to ALNO Group's main creditor, Bauknecht Hausgeräte GmbH ("<u>Bauknecht</u>").  Bauknecht has been part of the Whirlpool group of companies since 1989.  Whirlpool, a Delaware corporation, is head of that corporate family and at all relevant times exercised substantial influence over Bauknecht.

14. On October 18, 2012, Bauknecht and the Debtor entered into a new supply agreement to govern payment terms of receivables and require the Debtor to deliver weekly, monthly and quarterly financial reports and forecasts to Bauknecht, including reconciliations of the purchase of appliances by the ALNO Group from Bauknecht.

15. Over the past eight years, the Debtor undertook numerous restructuring measures, including financing through Bauknecht and other standstill arrangements to defer payment on certain accounts receivables the Debtor owed to Bauknecht. Bauknecht's dealings with ALNO Group were managed by Mr. Marc Bitzer, who since January 2006 has held various executive positions in Whirlpool and its affiliates.  Mr. Bitzer simultaneously served as a member of the Debtor's supervisory board between December 5, 2012 and February 19, 2015. In October 2017, Mr. Bitzer became President and Chief Executive Officer of Whirlpool.  The following chart shows the functions of Mr. Bitzer in the Whirlpool group and with the Debtor:

| January 2006 – November 2014 | Executive Vice President | Whirlpool Corporation |
|---|---|---|
| January 2009 – 2013 | President of Whirlpool North America and President of U.S. operations | Whirlpool Corporation |
| November 2012 – February 2015 | Member of the supervisory board | Debtor |
| April 2013 – November 2014 | President | Whirlpool North America & Whirlpool Europe, Middle East & Africa (EMEA) |

| November 2014 – October 2015 | Vice Chairman | Whirlpool Corporation |
| October 2015 – Present | President | Whirlpool Corporation |
| October 2017 - Present | Chief Executive Officer | Whirlpool Corporation |

16. Despite the repeated restructuring efforts, the Debtor's financial condition further deteriorated and the restructuring attempts ultimately failed. Bauknecht continued to be the main source of funding for ALNO Group and, in close cooperation with Bauknecht and representatives of Whirlpool, the Debtor attempted to improve the situation through short-term deferrals. However, the Debtor's liquidity continued to decline and its over-indebtedness deepened.

17. Under German insolvency law, the managing director of a stock corporation (in German, "Aktiengesellschaft") like the Debtor is obligated to file for the commencement of insolvency proceedings without undue delay, but no later than within three weeks once the corporation is either illiquid or over-indebted.

18. Illiquidity pursuant to Section 17 of the German Insolvency Code is assumed if the corporation is no longer able to meet its debts as they fall due. German courts have held that, generally, at least 90% of due obligations have to be covered by cash or cash equivalents.

19. Under Section 19 of the German Insolvency Code, a corporation is over-indebted if its assets no longer cover its liabilities and the corporation does not have a positive going-concern prognosis, which is generally the case if there is less than a 50% chance that the corporation will avoid illiquidity in the present and subsequent financial year.

20. Under German insolvency law, the failure to timely file for insolvency potentially subjects the managing director of the insolvent company to personal liability for all payments the corporation makes after it became insolvent, a claim that the insolvency administrator is authorized to pursue. Failure to file for insolvency on time also subjects the managing director to criminal charges. German insolvency law further provides that stakeholders in an insolvent company, like banks, creditors, or other sources of financing, can be held responsible for aiding and abetting the managing director in the failure to timely file an insolvency proceeding if they knowingly act in cooperation or coordination with the managing director to delay commencement of an insolvency proceeding, in which case such stakeholders are subject to the same civil and criminal liability as the managing director.

21. According to the findings of Andersch AG ("Andersch"), a German CPA firm that is one of the market leaders in Germany for restructuring-related services and restructuring opinions, at least some of the ALNO Group companies, including the Debtor, were insolvent due to illiquidity as of August 2013, if not earlier. Bauknecht continued to financially prop up the Debtor and the ALNO Group in various ways despite being aware of management's obligation to file for insolvency.

22. According to Andersch's expert opinion, the Debtor and at least some of the ALNO Group companies were over-indebted as defined by Section 19 of the German Insolvency Code as of the end of June 2013, if not earlier.

23. Between January 1, 2013, and July 12, 2017, the ALNO Group made payments to Bauknecht in a total amount of approximately 146.7 million EUR, including approximately 23.4 million EUR paid by the Debtor to Bauknecht.

C. **Continued Financing and Substantial Controlling Influence by Bauknecht and Whirlpool**

24. After the repayment of bank loans by ALNO Group in 2012, Bauknecht was the only remaining, continuous source of financing to the ALNO Group. The Debtor also issued public bonds totaling 44.1 million EUR in the aggregate, but the proceeds from this bond issuance were used primarily to repay the existing claims of Bauknecht against the ALNO Group.

25. Bauknecht consistently had sizeable due claims against the ALNO Group. During the period between September 30, 2013, and June 30, 2017, the percentage of ALNO Group liabilities due to Bauknecht was at least 51% of all of its liabilities, with the typical percentage ranging between 60% and 70% of all liabilities.

26. Bauknecht was consistently the largest creditor of the ALNO Group, and the survival of the ALNO Group was dependent on Bauknecht's decisions and its willingness to defer payments.

27. Whirlpool had an indirect but substantial interest in the Debtor since at least February 11, 2004 through various of its affiliated entities. As described above, Bauknecht, a subsidiary that was owned and controlled by Whirlpool, had an interest in the Debtor since at least July 18, 2004 through its role as primary creditor and, since 2012, controlling financier. Whirlpool also possessed an ownership interest in the Debtor through various subsidiaries. From at least July 13, 2012 through November 26, 2016, Whirlpool Germany GmbH ("Whirlpool Germany"), a direct subsidiary of Whirlpool, controlled between 12.5% and 33.58% of the Debtor's shares. Through these interests, Whirlpool consistently exerted a controlling influence on Bauknecht and the Debtor.

**D.     The Debtor's Avoidance Action and Lender Liability Claims Against Bauknecht and Potential Claims Against Whirlpool and Mr. Bitzer**

28.     Bauknecht, Whirlpool, and Mr. Bitzer knew that the Debtor was insolvent and obligated to file for the commencement of insolvency proceedings, or at least had knowledge of the circumstances triggering such obligation. They knew in particular that the Debtor could not meet its liabilities as they came due because Bauknecht, Whirlpool, and Mr. Bitzer were continuously informed about the Debtor's financial situation pursuant to the terms of the supply agreement, and due to Mr. Bitzer's service on the Debtor's supervisory board.

29.     Bauknecht, Whirlpool and Mr. Bitzer were also aware of the fact that it was solely Bauknecht's financing activity which enabled the ALNO Group to maintain operations amidst its financial hardship and illiquidity, thus creating the misleading appearance of creditworthiness with other suppliers and other creditors.

30.     Bauknecht delayed the commencement of insolvency proceedings of the Debtor (and other ALNO Group entities) by inadequately financing the Debtor to its own advantage and deceiving other creditors – namely the creditors of the ALNO bonds – regarding the borrowing power of the Debtor and the ALNO Group. Bauknecht benefitted from this conduct by inducing the Debtor and the other ALNO Group entities to repay their debt to Bauknecht ahead of other creditors, and by propping up the Debtor and the other ALNO Group entities so that Bauknecht could continue using the Debtor's brands to market Bauknecht's products long after the Debtor should have stopped operating its business. In Germany, the ALNO Group, including the Debtor, was an important distribution channel for Bauknecht's products, if not the most important.

31.     German tort law is contained in Sections 823, *et seq.* of the German Civil Code. As a blanket clause, Section 826 of the German Civil Code imposes liability on anybody

who willfully acts *contra bonos mores* to the detriment of others. In the context of lender liability, German courts have held lenders liable in two scenarios:

- When a creditor, such as a bank or a supplier, continues to finance an insolvent entity in order to enable the insolvent company to uphold its business operations and to obtain an undue special benefit compared to third party creditors, such creditor shall be liable to the insolvency administrator of that insolvent entity in the amount of the payments made by the insolvent entity to the creditor since the day on which the entity became insolvent; or
- When a creditor, such as a bank or a supplier, delays the required insolvency filing of an insolvent entity to obtain an undue special benefit compared to third party creditors, the creditor shall be liable in the amount of any negative difference between what is available to all creditors compared with what would have been available if there had been no delay in filing.

32. The payments made to Bauknecht are also avoidable pursuant to Section 133 of the German Insolvency Code if the ALNO Group acted intentionally to the detriment of the other creditors, and if the other party (in this case, Bauknecht) knew about this intent.

33. The German Insolvency Administrator has asserted avoidance claims against Bauknecht in the German Proceeding under the German Insolvency Code, as well as claims under German tort law, as described above. The avoidance claims are based on Sections 133, Paragraphs 1, 2 and 3, and Section 135, Paragraphs 1 and 2 of the German Insolvency Code. The Debtor granted preferential treatment to Bauknecht because payments to Bauknecht assured further financing from Bauknecht and, in doing so, omitted payments to other creditors.

34. Pursuant to Section 135(1) and (2) of the German Insolvency Code, payments from the ALNO Group during the period when Whirlpool Germany was a shareholder

of the Debtor are also contestable, and have been contested by the German Insolvency Administrator. Pursuant to Section 135(1) and (2) of the German Insolvency Code, payments on shareholder loans can be contested if they are made within one year prior to filing for insolvency.

35. The German Insolvency Administrator is also investigating potential claims against Whirlpool and Mr. Bitzer on the basis of their having aided and abetted Bauknecht in the above-described *contra bonos mores* financings, as described herein. German tort law recognizes that a person or entity who aides or abets the tortfeasor shall also be liable to the claimant.

36. Based on an investigation conducted by and on behalf of the German Insolvency Administrator, including review of approximately 60,000 e-mails and other documents, Whirlpool and Mr. Bitzer personally managed the business relationship between Bauknecht and the ALNO Group, and made all relevant decisions regarding the financing provided to the Debtor and to the ALNO Group by Bauknecht. Discussions about business decisions, meetings and information flow took place directly between the board of the Debtor and Mr. Bitzer. The German Insolvency Administrator believes that the managing directors of Bauknecht merely executed and implemented the decisions made in the first instance by Mr. Bitzer personally.

37. According to current information available to the German Insolvency Administrator, all of the many requests made of Bauknecht by the board of the Debtor for a deferral or standstill of Bauknecht's claims against the Debtor and the other ALNO Group companies – approximately 30 such requests were made between 2013 and 2017 – were directed to Mr. Bitzer and Whirlpool directly, not to management of Bauknecht. Furthermore, the board

of the Debtor, namely board members Mr. Max Müller and Ms. Ipek Demirtas, continuously discussed with Mr. Bitzer and Whirlpool: (i) the general commercial situation of the Debtor; (ii) financing available from Bauknecht to the Debtor and the ALNO Group; and (iii) possible third-party financing. The board members also informed Mr. Bitzer and Whirlpool that the Debtor and the ALNO Group needed to refrain from paying other suppliers in order to be able to (partially) repay Bauknecht's claims against the Debtor and the other ALNO Group companies.

38.    In filing this Verified Petition for the Debtor, I, as the Foreign Representative, am seeking, in addition to the relief automatically available pursuant to Section 1520(a) of the Bankruptcy Code upon recognition of the German Proceeding as a foreign main proceeding, final relief upon the granting of recognition pursuant to Sections 1521(a)(1), 1521(a)(4), 1521(a)(6) and 1521(a)(7) of the Bankruptcy Code. Without limiting the foregoing, I, as the Foreign Representative for the Debtor, seek relief, on a final basis, "providing for the examination of witnesses, the taking of evidence and the delivery of information concerning [the Debtor's] assets, affairs, rights, obligations and liabilities."  11 U.S.C. § 1521(a)(4). Specifically (but without limitation), I, as the Debtor's Foreign Representative, seek to engage in discovery, as permitted by Federal Rule of Bankruptcy Procedure 2004 ("Bankruptcy Rule 2004"), Section 542(e) of the Bankruptcy Code, and other applicable law, to identify and pursue an investigation of the Debtor's assets, including documents and testimony relating to the Debtor's claims against Bauknecht that have been asserted in the German Proceeding, and potential causes of action against Whirlpool, a Delaware corporation, and Mr. Bitzer, its Chief Executive Officer, for their involvement in Bauknecht's improper actions taken toward the Debtor, as described above. Accordingly, investigation of documents and testimony in the United States is required to further

my investigation as Foreign Representative, including to determine the existence of claims against Whirlpool and Mr. Bitzer.

## RECOGNITION AND OTHER RELIEF REQUESTED

**A.     Recognition of the German Proceeding as a Foreign Main Proceeding**

39.     The German Proceeding is a collective judicial proceeding brought under the German Insolvency Code and supervised by the German Court.  The German Insolvency Code provides for a controlled liquidation procedure designed to enable an insolvency administrator to marshal and liquidate assets, pursue claims, and otherwise maximize the value of assets available for distribution to creditors.  The aim of insolvency administration like the German Proceeding is the distribution of assets to the creditors on a pro rata basis.  Parties in interest may lodge their claims, be heard in creditors' meetings, and weigh in on significant events.

40.     The Debtor is no longer operating its business.  The German Insolvency Administrator has already sold substantially all of the Debtor's operating assets in a procedure akin to a sale under section 363 of the Bankruptcy Code, and is now, with me as Foreign Representative, identifying and marshalling the Debtor's remaining assets, including those here in the United States.  The German Insolvency Code also provides for a centralized process to assert and resolve claims against a debtor's estate by the representatives of a debtor's estate in order to maximize distributions to stakeholders.

41.     I am informed that in order to be recognized as a "foreign main proceeding," a proceeding must be pending in the country where the debtor has its "center of main interests," which I understand to be the functional equivalent of a headquarters, principal place of business or "nerve center."  I believe that the German Proceeding meets this

my investigation as Foreign Representative, including to determine the existence of claims against Whirlpool and Mr. Bitzer.

## RECOGNITION AND OTHER RELIEF REQUESTED

**A.     Recognition of the German Proceeding as a Foreign Main Proceeding**

39.     The German Proceeding is a collective judicial proceeding brought under the German Insolvency Code and supervised by the German Court.  The German Insolvency Code provides for a controlled liquidation procedure designed to enable an insolvency administrator to marshal and liquidate assets, pursue claims, and otherwise maximize the value of assets available for distribution to creditors.  The aim of insolvency administration like the German Proceeding is the distribution of assets to the creditors on a pro rata basis.  Parties in interest may lodge their claims, be heard in creditors' meetings, and weigh in on significant events.

40.     The Debtor is no longer operating its business.  The German Insolvency Administrator has already sold substantially all of the Debtor's operating assets in a procedure akin to a sale under section 363 of the Bankruptcy Code, and is now, with me as Foreign Representative, identifying and marshalling the Debtor's remaining assets, including those here in the United States.  The German Insolvency Code also provides for a centralized process to assert and resolve claims against a debtor's estate by the representatives of a debtor's estate in order to maximize distributions to stakeholders.

41.     I am informed that in order to be recognized as a "foreign main proceeding," a proceeding must be pending in the country where the debtor has its "center of main interests," which I understand to be the functional equivalent of a headquarters, principal place of business or "nerve center."  I believe that the German Proceeding meets this

requirement.  As described above, the Debtor is headquartered in Germany and the vast majority of its substantive business operations took place in Germany.  In other words, Germany is where the Debtor's principal place of business and "nerve center" is located.  Furthermore, Germany is the also the center of main interests of the Debtor according to German and European Law; the German Court opened main insolvency proceedings pursuant to European Insolvency Regulations because the Debtor's center of main interests is and has been in Germany.

      42.    Additionally, I understand that another requirement for recognition is that the foreign representative applying for recognition be "a person or body."  I understand that the Bankruptcy Code defines "person" to include corporations.  As the Foreign Representative in this case, I am a "person" within the meaning of the Bankruptcy Code.  Accordingly, I believe that this requirement is met.

      43.    I further understand that the Verified Petition must satisfy the provisions of section 1515 of the Bankruptcy Code, which I understand to require the following: (a) the filing of a petition for recognition by the foreign representative; (b) the filing, with the petition, of a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative; (c) a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative; and (d) English translations of documents, where applicable.  I believe these requirements are all met.

      44.    As to (a) above, on the date hereof, I, as the Foreign Representative have filed the Verified Petition on behalf of the Debtor.  As to (b) above, certified copies of the Commencement Order, which among other things opened the German Proceeding for the Debtor, and the Appointment Order, which appoints me and authorizes me to act as the Foreign

Representative as attached as Exhibits A and B to the Verified Petition. As to (c) above, as I have indicated in the Verified Petition and related documents filed in support thereof, the German Proceeding is the only foreign proceeding known to me as the Foreign Representative. Finally, as to (d) above, the foregoing Commencement Order and Appointment Order each have been provided to this Court as certified English translations of the original documents.

45. For these reasons, I believe that the German Proceeding qualifies as a "foreign main proceeding" and respectfully request, as Foreign Representative, that the Court recognize it as such.

**B.    Relief Sought Under Section 1521(a)(4) of the Bankruptcy Code**

46. I am informed that Chapter 15 of the Bankruptcy Code also allows a foreign representative of an insolvency proceeding outside of the United States to gain access to the United States court system, including section 1521(a)(4) which authorizes bankruptcy courts to enter an order allowing a foreign representative to take "the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities." 11 U.S.C. § 1521(a)(4). Once a Chapter 15 case is commenced, Bankruptcy Rule 2004 authorizes a foreign representative to conduct examination relating "to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate. . ." Fed. R. Bankr. P. 2004(a), 2004(b). Bankruptcy Rule 2004 also permits the taking of testimony through compelled examination.

47. I anticipate filing one or more motions to authorize examinations under section 1521(a)(4) of the Bankruptcy Code, Bankruptcy Rule 2004, and other applicable law, as more fully described above, shortly after the Court recognizes this Verified Petition.

C.  **Scheduling and Noticing Procedures**

48.  I, as the Foreign Representative, have also filed a motion requesting that the Court schedule a final recognition hearing and approve related noticing procedures (the "Scheduling/Notice Procedures Motion").  I can attest that there are several parties in interest in this Chapter 15 proceeding, including Bauknecht, Whirlpool, Mr. Bitzer and the assignee in the Alno USA Assignment Proceeding, who need to be provided with, among other things, notice of the proposed final order, the recognition objection deadline, and the recognition hearing. The Foreign Representative has prepared a proposed form of notice advising of these and related matters (the "Recognition Hearing Notice"), a copy of which is annexed to the Scheduling/Notice Procedures Motion.

49.  Under the facts and circumstances of the Debtor's Chapter 15 case, I submit that service of the Recognition Hearing Notice in the manner proposed in the Scheduling/Notice Procedures Motion will provide those parties identified as the Notice Parties in the Scheduling/Notice Procedures Motion with due and sufficient notice of the relief requested in the Recognition Motion (as defined therein) and associated objection deadline and hearing dates.

50.  Therefore, I believe that the relief requested in the Notice Procedures Motion is necessary and appropriate and is in the best interests of the Court, the Debtor, its creditors, and other parties-in-interest.

I certify penalty of perjury under the laws of the U.S. that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 19th day of November, 2018

_____
Tobias Wahl
Special Insolvency Administrator
c/o anchor Rechtsanwälte
L9,11
68161 Mannheim
Germany